# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

PATRICK RAY MAYLONE, JR.

                       Plaintiff,

      -vs-

EQUIFAX INFORMATION
SERVICES, LLC,

                   Defendant.

Case No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Patrick Ray Maylone, Jr. ("Plaintiff"), a living, breathing 48-year-old consumer, by and through his undersigned counsel, brings this Complaint against Defendant Equifax Information Services, LLC ("Defendant" or "Equifax") for actual, statutory, and punitive damages, costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of Equifax's mixing of Plaintiff's credit file with his deceased father and thereafter inaccurately reporting Plaintiff as deceased and without a credit score.

1

## **INTRODUCTION**

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the credit bureau defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      The three major national CRAs are Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

5.      These CRAs sell credit information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C.§1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

8.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.*

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

9.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

10.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with

fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

11.     "Mixed files" create a false description and representation of a consumer's credit history.

12.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

13.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

14.     Mixed files are not a new phenomenon. Equifax, Experian, and Trans Union have been put on notice of the existence of mixed files and the fact that their procedures for creating credit files, including their matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

15.     More recently, all three credit bureaus, Equifax, Experian, and Trans Union, have been the subject of numerous state attorney general actions relating to their mixed file problems.

16.   For example, in 2015, the New York Attorney General filed charges and settled claims with Equifax, Experian, and Trans Union over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

17.   Notwithstanding Equifax, Experian, and Trans Union's notice and being subject to repeated enforcement actions, mixed files persist despite consumers' unique personal identifying information, such as Social Security numbers, dates of birth, and addresses.

18.   Further, mixed files result in the disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.

19.   Equifax, Experian, and Trans Union have each been sued thousands of times wherein an allegation was made that Equifax, Experian, and Trans Union violated the FCRA. Moreover, Equifax, Experian, and Trans Union are sued, at a minimum, hundreds of times each year wherein an allegation is made that they mixed a consumers' credit file with that of another person.

---

[1] https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited October 3, 2022; *see also* https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited October 3, 2022.

6

20.     Private FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

21.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case No. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000 in actual damages and $5 million in punitive damages. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

22.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000 in actual damages and $2.7 million in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

23.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000 in actual  damages and $18.4 million in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them

despite Ms. Millers' numerous disputes. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

24.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

25.    No less than three federal Courts of Appeal have held that a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

26.    Finally, the Federal Trade Commission has specifically warned consumer reporting agencies, including Equifax, Experian, and Trans Union, to review their procedures when a mixed file case occurs.

27.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain

a significant problem for Equifax, Experian, and Trans Union, as well as innocent consumers, including Plaintiff.

28.    Plaintiff's claims arise out of Defendant's blatantly inaccurate credit reporting, wherein Defendant reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score. After Plaintiff's numerous disputes of Defendant's deceased reporting, which put Defendant on notice of the undisputed fact that Plaintiff is alive, Defendant continued to report Plaintiff as "deceased" and without a credit score in response to requests from third party creditors for Plaintiff's Equifax credit report.

29.    Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether the information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff's credit file in violation of the FCRA, 15 U.S.C. § 1681i.

30.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

31.    Plaintiff Patrick Ray Maylone, Jr. ("Plaintiff"), is a natural person who resides in New Port Richey, Florida, and is a consumer as that term is defined in 15 U.S.C. § 1681a(c).

32.    Defendant Equifax Information Services, LLC ("Defendant" or "Equifax") is a limited liability company with its principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Georgia, including this District.

33.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

34.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

35.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant resides in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

36.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

37.    The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

38.    The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

### Equifax's Processing of Credit Information

39.    Equifax regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

40.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

41.     Equifax collects information from thousands of furnishers.

42.     The process by which Equifax receives, sorts, and stores information is largely electronic.

43.     Furnishers report credit information to Equifax through the use of coded tapes that are transmitted to Equifax on a monthly basis through software known as Metro 2.

44.     Equifax takes the credit information reported by furnishers and create consumer credit files.

45.     Equifax maintains credit files on more than 200 million consumers.

46.     Credit files are frequently updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**Defendant's Mixed File Problem**

47.     Defendant knows that different consumers can have similar names.

48.     Defendant knows that different consumers can have similar Social Security numbers.

49.     Defendant knows that different consumers with similar names can also have similar Social Security numbers.

50.     Defendant knows that public records often do not contain identifying information such as Social Security numbers or dates of birth.

51.     Defendant will match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information it maintains about the consumer in the consumer's credit file or files.

52.     Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

53.     Sometimes Defendant's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a "mixed," "merged," or "combined" credit file.

54.     Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

55.     Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant

containing information belonging to another consumer, specifically, Plaintiff's deceased father.

56.   A mixed or merged credit file is the result of Defendant inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

57.   There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms (the database rules) used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

58.   The success or failure of these algorithms or rules is both a function of the rules themselves and the information provided by the furnishers of the tradeline information to Defendant.

59.   A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

60.   These rules also determine which credit files are selected by Defendant's algorithm(s) and merged to create a complete consumer report.

61.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

### Defendant's Practices Concerning the Sale of Credit Reports on the "Deceased"

62.    The three main credit bureaus, including Equifax, Experian, and Trans Union, sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

63.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Equifax, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

64.    Equifax routinely places a "deceased" notation or marking on reports when it is advised by any of its data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

65.    Equifax's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2. Equifax does not request or require a death certificate from any of its data sources, which advise that a

15

consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

66.     Equifax also does not request or require any proof from any data source, which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

67.     Equifax does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

68.     In some cases, in order to assure accuracy, Equifax may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Equifax does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code or "U" undesignated code is furnished to them to be placed in said consumer's credit file or report.

69.     Equifax regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Equifax does not cross-reference the "X" or "U" code received from data furnishers with the Death Master File in order to

determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

70.    Equifax will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

71.    Equifax does not employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

72.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Equifax does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

73.    Even in instances where the purportedly deceased consumer communicates directly with Equifax, Equifax does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

74.    Once a "deceased" mark is placed upon a consumer's report, Equifax will not calculate and will not provide a credit score for that consumer. Rather, Equifax will report that the consumer's credit score is "N/A."

75.    Equifax knows that third party credit issuers require a credit score in order to process a given credit application.

76.    Equifax knows that consumers without credit scores are unable to secure any credit from most credit issuers.

77.    Equifax knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

78.    Equifax has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because the credit bureau defendants are inaccurately reporting them as "deceased" and without a credit score.

79.    Equifax has received and documented many disputes from consumers complaining that their credit reports had them erroneously marked as "deceased."

80.    Equifax knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U" code, even when said consumers are not on the Death Master File and are in fact alive.

81.     Nevertheless, Equifax does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports are in fact deceased.

82.     Equifax does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot the furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

83.     Nor does Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

84.     For years after a consumer's actual death, Equifax will continue to sell credit reports about that consumer.

85.     Equifax will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

86.     Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

87.     Equifax profits from the sale of reports on deceased consumers.

88.     Equifax has in its respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

89.     Equifax knows that truly deceased consumers do not apply for credit.

90.     Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

91.     Equifax knows that identity theft and credit fraud are serious and widespread problems in our society.

92.     Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

93.     Equifax has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

94.     Equifax sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

95.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Equifax to sell credit reports, absent a court order.

96.    Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Truist Bank Denies Plaintiff's Application for a Home Equity Line of Credit in June 2023**

97.    In or about mid-June 2023, Plaintiff began searching for options for a home equity line of credit (a "HELOC") in order to consolidate debt and free up funds for home improvements he hoped to make in the near future.

98.    On or about June 14, 2023, Plaintiff submitted a credit application for a HELOC to Truist Bank.

99.    As part of his application, Plaintiff provided Truist Bank with his personal identification information, including his Social Security number, and authorized it to obtain his credit report(s).

100.    On or about June 14, 2023, Truist Bank requested Plaintiff's credit report and score from Equifax.

101.    On or about June 14, 2023, Equifax sold a credit report to Truist Bank in response to Plaintiff's credit application for a HELOC.

102.   On or about June 14, 2023, Truist Bank denied Plaintiff's credit application based on the contents of Plaintiff's Equifax credit report.

103.   Shortly thereafter, Plaintiff received a letter in the mail from Truist Bank stating that his credit score was not available from Equifax.

104.   As of June 14, 2023, Plaintiff's Equifax credit report indicated that Plaintiff was deceased.

105.   Equifax's reporting was grossly inaccurate: Plaintiff is not deceased and has a credit score.

106.   As a result of Equifax's inaccurate deceased reporting, Truist Bank was unable to extend Plaintiff an offer of credit.

107.   Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintains concerning Plaintiff.

**Plaintiff's First Dispute with Equifax in Late June 2023**

108.   Shortly thereafter, in late June 2023, Plaintiff received notification that he was being reported as deceased by the credit bureaus.

109.   Plaintiff subsequently called Equifax to dispute its inaccurate deceased reporting and requested that they correct the issue, as it was preventing him from obtaining credit.

110.  Plaintiff also informed Equifax that the issue could be originating from information belonging to his deceased father appearing on his credit report, as he and his father share the same name (Plaintiff is a "Junior").

111.  Plaintiff never heard anything further from Equifax regarding this dispute.

112.  Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information within 30 days of receipt of Plaintiff's dispute, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Plaintiff's Inaccurate Equifax Credit File as of July 2023

113.  As of July 28, 2023, Equifax was reporting the following credit accounts with an inaccurate "Account Status" of "CONSUMER_DECEASED."

     a.  SYNCB/AMAZON PLCC
       Account Number xxxxxxxxxxxx 2886
       Date Opened: Dec 02, 2018
       Account Status: CONSUMER_DECEASED

     b.  SYNCB/JC PENNEYS
       Account Number: xxxxxxxxxxxx 5343
       Date Opened: Apr 14, 2013
       Account Status: CONSUMER_DECEASED

     c.  MERRICK BANK
       Account Number: xxxxxxxxxxxx 8168
       Date Opened: Jul 09, 2007
       Account Status: CONSUMER_DECEASED

**Plaintiff's Second Dispute with Equifax in August 2023**

114.  On or about August 22, 2023, extremely shocked, frustrated, and embarrassed by Defendant's inaccurate reporting, Plaintiff mailed a written dispute letter to Defendant via certified mail, disputing the deceased notations appearing on the above referenced credit tradelines.

115.  Plaintiff requested that Defendant reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

116.  As part of his dispute, Plaintiff provided sufficient personal identification information, including his full name, date of birth, Social Security number, and current address; a photocopy of his current Florida driver's license; a photocopy of his Social Security card; and a copy of his inaccurate credit report.

**Defendant's Method for Considering Consumer Credit Report Disputes**

117.  The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

118.  The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated

consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

119.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

120.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

121.    Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

122.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

123.    These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

124.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

125.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

126.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

### Equifax's Response to Plaintiff's August 2023 Dispute

127.    On or about September 2, 2023, Equifax completed its reinvestigation and mailed dispute results to Plaintiff.

128.    Upon receipt of those dispute results, Plaintiff discovered that Equifax, despite stating in its dispute results that the previously referenced tradelines containing a deceased notation "ha[d] been updated to no longer report as deceased," had actually failed to update the status of those tradelines and continued to inaccurately report them with a deceased notation.

129.    By failing to correct the inaccurate deceased notations, Equifax failed to conduct a reasonable reinvestigation of Plaintiff's August 2023 dispute, or any

26

reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information within 30 days of receipt of Plaintiff's dispute, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's Third Dispute with Equifax in November 2023**

130.  On or about November 30, 2023, growing more frustrated and irritated by Equifax's inaccurate reporting, Plaintiff again mailed a written dispute letter to Defendant via certified mail, disputing the deceased notations appearing on the previously referenced credit tradelines.

131.  Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

132.  As part of his dispute, Plaintiff again provided sufficient personal identification information, including his full name, date of birth, Social Security number, and current address; a photocopy of his current Florida driver's license; a photocopy of his Social Security card; and a copy of his inaccurate credit report.

**Equifax's Response to Plaintiff's November 2023 Dispute**

133.  Plaintiff did not receive a response from Equifax to his November 2023 dispute.

134.  On January 9, 2024, in order to determine if, and/or how, Equifax addressed his previous dispute, Plaintiff requested and obtained a copy of his Equifax credit report.

135.   Upon review, he found that while Equifax updated the status of the Merrick Bank tradeline, account number ending 8168, to "UNAVAILABLE" instead of "CONSUMER_DECASED," Equifax was still reporting him as deceased in connection with the two previously referenced Synchrony Bank tradelines.

136.   By failing to correct all of the inaccurate deceased notations, Equifax failed to conduct a reasonable reinvestigation of Plaintiff's November 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information within 30 days of receipt of Plaintiff's dispute, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's Fourth Dispute with Equifax in January 2024**

137.   On or about January 15, 2024, remaining extremely frustrated and irritated by Equifax's inaccurate reporting, Plaintiff mailed a ***third*** written dispute letter to Defendant via certified mail, disputing the deceased notations remaining on the previously referenced Synchrony Bank credit tradelines.

138.   Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

139.   As part of his dispute, Plaintiff again provided sufficient personal identification information, including his full name, date of birth, Social Security number, and current address; a photocopy of his current Florida driver's license; a photocopy of his Social Security card; and a copy of his inaccurate credit report.

28

**Equifax's Response to Plaintiff's January 2024 Dispute**

140.   On or about January 27, 2024, Equifax completed its reinvestigation and mailed dispute results to Plaintiff.

141.   Upon review, Plaintiff found that Equifax finally removed the last of the inaccurate deceased notations in his Equifax credit file, though it continued to report personal and credit information Plaintiff understood to belong to his deceased father.

**Equifax Fails to Provide a Score to Ferman BMW in April 2024**

142.   On or about April 22, 2024, in search of a new vehicle, Plaintiff applied for auto financing at Ferman BMW, a local dealership.

143.   As part of his application, Plaintiff provided Ferman BMW with his personal identification information, including his Social Security number, and authorized it to obtain his credit report(s).

144.   On or about April 22, 2024, Ferman BMW requested Plaintiff's credit report and score from Equifax.

145.   On or about April 22, 2024, Equifax sold a credit report to Ferman BMW in response to Plaintiff's credit application for auto financing.

146.   Shortly thereafter, Plaintiff received a letter in the mail from Ferman BMW informing him that his credit score was not available from Equifax.

147.   Equifax's reporting was grossly inaccurate: Plaintiff has a credit score.

148.    While Plaintiff was ultimately able to obtain an auto loan, due at least in part to a pre-existing relationship with the dealership where Plaintiff made exclusively timely payments, it raised questions at the dealership about his creditworthiness.

149.    By failing to provide a credit score for Plaintiff, Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintains concerning Plaintiff.

**Plaintiff's Fifth Dispute with Equifax in June 2024**

150.    On or about June 26, 2024, upset and frustrated by Equifax's continued inaccurate reporting, Plaintiff mailed a ***fourth*** written dispute letter to Defendant via certified mail, disputing the lack of credit score and continued reporting of the Synchrony Bank/Amazon tradeline he understood to actually belong to his deceased father.

151.    Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

152.    As part of his dispute, Plaintiff again provided sufficient personal identification information, including his full name, date of birth, Social Security number, and current address; a photocopy of his current Florida driver's license; a photocopy of his Social Security card; and a copy of his inaccurate credit report.

**Equifax's Response to Plaintiff's June 2024 Dispute**

153.   On or about July 6, 2024, Equifax sent Plaintiff a letter requesting additional information to verify his identity because it "[did] not match the information...currently on [his] credit file," even though Plaintiff had provided a copy of his valid driver's license with his current address and Social Security card, which matched the information on his Equifax credit file.

154.   By failing to remove the Synchrony Bank/Amazon tradeline and requesting information Plaintiff had already provided to Equifax, Equifax failed to conduct a reasonable reinvestigation of Plaintiff's June 2024 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information within 30 days of receipt of Plaintiff's dispute, in violation of 15 U.S.C. § 1681i(a)(1)(A).

155.   As a result of Defendant's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied an home equity line of credit opportunity; loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; economic loss; detriment to his credit rating and score; increased reliance on existing credit lines; and emotional distress, including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin; and the mental and emotional pain, anguish, humiliation,

embarrassment of credit denials and being falsely reported as deceased and without a credit score.

156.   At all times pertinent hereto, the Equifax was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Equifax herein.

157.   At all times pertinent hereto, the conduct of Equifax, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in negligent disregard for federal law and Plaintiff's rights.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

158.   Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-157 as if fully stated herein.

159.   Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintains concerning Plaintiff.

160.   As a result of Defendant's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied an

home equity line of credit opportunity; loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; economic loss; detriment to his credit rating and score; increased reliance on existing credit lines; and emotional distress, including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin; and the mental and emotional pain, anguish, humiliation, embarrassment of credit denials and being falsely reported as deceased and without a credit score.

161.   Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

162.   Plaintiff is entitled to recover attorney's fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation

163.   Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-157 as if fully stated herein.

164.   Defendant violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's credit file after it received multiple notices of such inaccuracies; by failing to conduct a lawful reinvestigation on numerous occasions of disputed accounts and information in Plaintiff's credit file; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

165.   As a result of Defendant's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied an home equity line of credit opportunity; loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; economic loss; detriment to his credit rating and score; increased reliance on existing credit lines; and emotional distress, including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin; and the mental and emotional pain, anguish, humiliation, embarrassment of credit denials and being falsely reported as deceased and without a credit score.

166.   Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

34

167.    Plaintiff is entitled to recover attorney's fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a)    Determining that Defendant negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs from Defendant as provided by the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

168.    Plaintiff demands a trial by jury.

Respectfully submitted,

Dated: June 13, 2025        */s/ Joseph P. McClelland*
Joseph P. McClelland
JOSEPH P. MCCLELLAND, LLC
Georgia Bar No: 483407
235 East Ponce de Leon Avenue, Suite 215
Decatur, GA 30030

Telephone: (770) 775-0938
Fax: (470) 468-0070
Email: joseph@jacksonlaws.com

Bryan L. Plaster, MN Bar No. 0402792*
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (651) 728-5423
Fax: (612) 584-4470
bplaster@bm.net
*Pro Hac Vice Forthcoming

ATTORNEYS FOR PLAINTIFF